882 P.2d 548

**STATE of New Mexico ex rel. Attorney General Tom UDALL, Plaintiff– Appellant,**

v.

**PUBLIC EMPLOYEES RETIREMENT BOARD, and each member of the Board in his or her official capacity, Ben D. Altamirano, et al., Defendants–Appellees.**

**No. 14954.**

Court of Appeals of New Mexico.

July 12, 1994.

Certiorari Granted Sept. 28, 1994.

Tom Udall, Atty. Gen., Robert Tabor Booms, Phyllis A. Dow, Asst. Attys. Gen., Santa Fe, for plaintiff-appellant.

Daniel Sanchez, Campos & Sanchez, Santa Fe, for defendants-appellants Simon Bustamante & Nancy Garcia.

Richard N. Carpenter, Michael R. Comeau, Jon J. Indall, Carpenter, Comeau, Maldegen, Brennan, Nixon & Templeman, Santa Fe, for defendants-appellees Fabian Chavez, Jr., et al.

## OPINION

HARTZ, Judge.

The New Mexico Constitution provides that the state legislature shall convene for a session not to exceed sixty days in odd-numbered years and a session not to exceed thirty days in even-numbered years. N.M. Const. art. IV, § 5. Additional special sessions may be convened, art. IV, § 6, but they may not exceed thirty days unless an impeachment trial is pending at the expiration of that period. *Id.;* art. IV, § 5. On paper the intent is evidently to have the legislative business of the state conducted by a group of citizens who volunteer a few weeks of their time each year to public issues. The reality is rather different. Although members of the legislature still spend only an average of forty-five days a year in session (special sessions are infrequent and last only a few days), the complexity of modern society and public interest in state government make participation in the legislature virtually a full-time job. Legislators typically attend innumerable meetings, official and unofficial, and respond to countless requests and demands from constituents and other interested persons.

Yet, there is little material reward for this labor. During their terms of office legislators receive only (1) per diem payment of $75 for each day's attendance during legislative sessions, art. IV, § 10(A); NMSA 1978, § 2–1–8 (Repl.Pamp.1994) (2) twenty-five cents per mile for one trip each session to and from the capitol, *id.,* and (3) per diem for attending interim committee meetings between sessions, art. IV, § 10(B); NMSA 1978, § 2–1–9 (Repl.Pamp.1994). These pay-

ments are not intended to enrich legislators but only to cover travel expenses. Perhaps they accomplish that purpose, but the per diem rates are hardly extravagant. The federal government's per diem rate for Santa Fe is $114. 58 Fed.Reg. 67,958 (1993) (to be codified at 41 C.F.R. ch. 301, app. A).

Service in the New Mexico legislature is undoubtedly a substantial financial sacrifice. Psychic reward is the chief compensation for this public service. In recognition of the financial sacrifice, the legislature has instituted a pension plan for its members. The pertinent provisions are as follows:

> State legislator member coverage plan 1 is applicable to state legislators and lieutenant governors.

NMSA 1978, § 10–11–39 (Repl.Pamp.1992).

> Under state legislator member coverage plan 1, the age and service requirements for normal retirement are:
>
> A. age sixty-five years or older and five or more years of credited service;
>
> B. age sixty-four years or older and eight or more years of credited service;
>
> C. age sixty-three years or older and eleven or more years of credited service;
>
> D. age sixty years or older and twelve or more years of credited service; or
>
> E. any age and fourteen or more years of credited service.

NMSA 1978, § 10–11–40 (Repl.Pamp.1992).

> A. Under state legislator member coverage plan 1, the annual amount of pension under form of payment A is equal to two hundred fifty dollars ($250) multiplied by credited service as a legislator or lieutenant governor, if the member served as legislator or lieutenant governor after December 31, 1959.
>
> B. Under state legislator member coverage plan 1, the annual amount of pension under form of payment A is equal to forty dollars ($40.00) multiplied by credited service as a legislator or lieutenant governor, if all service as a legislator or lieutenant governor is prior to January 1, 1960.

NMSA 1978, § 10–11–41 (Repl.Pamp.1992).

> A member under state legislator member coverage plan 1 shall contribute one hundred dollars ($100) for each year of credited service earned after December 31, 1959.

NMSA 1978, § 10–11–42 (Repl.Pamp.1992).

> The state shall contribute amounts sufficient to finance the membership of members under state legislator member coverage plan 1 on an actuarial reserve basis.

NMSA 1978, § 10–11–43 (Repl.Pamp.1992).

The equity and wisdom of this pension plan is a matter for the legislature and the governor. The judiciary plays no role in that determination. "[I]n constitutional adjudication, judges are not free to indulge in their private proclivities." *State ex rel. Anaya v. McBride*, 88 N.M. 244, 250, 539 P.2d 1006, 1012 (1975). It is, however, the role of the court (whether or not we wish it to be) to determine whether the legislative pension plan is compatible with the New Mexico Constitution. That is the subject matter of this litigation.

The Attorney General contends that the pension plan violates Article IV, Section 10, of the Constitution, which now reads:

> Each member of the legislature shall receive:
>
> A. as per diem expense the sum of not more than seventy-five dollars ($75.00) for each day's attendance during each session, as provided by law, and twenty-five cents ($.25) for each mile traveled in going to and returning from the seat of government by the usual traveled route, once each session as defined by Article 4, Section 5 of this constitution;
>
> B. per diem expense and mileage at the same rates as provided in Subsection A of this section for service at meetings required by legislative committees established by the legislature to meet in the interim between sessions; and
>
> C. *no other compensation, perquisite or allowance.* (Emphasis added.)

Before reaching the Constitutional issue, however, we must first address procedural matters raised by the Attorney General.

## I. AUTHORITY OF SUCCESSOR DISTRICT COURT JUDGE

The Attorney General filed suit in Santa Fe County District Court on December 28, 1987, seeking a judgment that the legislative pension plan is unconstitutional and that a portion of the benefits already received must be repaid. Named as defendants were the Public Employees Retirement Board (PERB) and various plan participants. The case was assigned to District Judge James Blackmer, who on December 29, 1988, issued an order finding the plan unconstitutional and prohibiting the PERB from paying any benefits to former legislators or their survivors. Several defendants appealed. We dismissed the appeal on the ground that the order was not a final, appealable order because it did not resolve the Attorney General's claim for refunds.

On remand the case was assigned to Judge Joe Cruz Castellano, Jr., who had succeeded Judge Blackmer on the district court. On June 15, 1992, Judge Castellano conducted a hearing on a motion to vacate Judge Blackmer's order. The ground of the motion was that all plan participants were indispensable parties but some (the "unjoined participants") had not been made parties at the time of Judge Blackmer's ruling. Although the Attorney General did not oppose joinder of the additional participants, he did oppose vacation of Judge Blackmer's order. Judge Castellano permitted joinder, vacated Judge Blackmer's order, and then ruled that the plan was constitutional.

On appeal the Attorney General contends that (1) the unjoined participants were not truly indispensable because their interests were being well-protected by the defendants already in the suit and (2) even if they were indispensable, their prior absence was not a jurisdictional matter that required vacation of Judge Blackmer's order. *See C.E. Alexander & Sons v. DEC Int'l*, 112 N.M. 89, 811 P.2d 899 (1991). In addition, the Attorney General contends that under the law-of-the-case doctrine, *see First Interstate Bank v. Heritage Square*, 113 N.M. 763, 766–67, 833 P.2d 240, 243–44 (1992), Judge Castellano should not have revisited and reversed Judge Blackmer's decision regarding constitutionality.

We reject the Attorney General's contentions. Regardless of whether the unjoined participants were indispensable parties, the district court had authority to reconsider the earlier non-final ruling by Judge Blackmer. Although it would be grossly inefficient for district courts to review repeatedly their interlocutory rulings, the law-of-the-case doctrine does not prohibit the practice. In approving a district judge's grant of a motion for summary judgment after an earlier judge had denied the motion, our Supreme Court recently explained:

> The district court "has the inherent authority to reconsider its interlocutory orders, and it is not the duty of the [district court] to perpetuate error when it realizes it has mistakenly ruled." *Melnick v. State Farm Mut. Auto Ins. Co.*, 106 N.M. 726, 728, 749 P.2d 1105, 1107 (1988). The grant [1] or denial of a motion for summary judgment is an interlocutory order, *see* SCRA 1986, 1–056(C), and, therefore, the district court could properly reconsider its previous ruling notwithstanding the fact that a different judge had issued that ruling.

*Tabet Lumber Co. v. Romero*, 117 N.M. 429, 431, 872 P.2d 847, 849 (1994) (first bracket in original). Given the importance of the issue of the constitutionality of the pension plan, it was in no manner inappropriate for Judge Castellano to overrule a prior interlocutory order that he considered erroneous.

We now address the merits. We hold that the legislative pension plan violates the New Mexico Constitution.

---

**1.** Because ordinarily the grant of a motion for summary judgment is a final, appealable order, the reference by the Supreme Court to the grant of a motion for summary judgment as being an interlocutory order must relate to a grant of summary judgment solely in favor of liability.

*See* SCRA 1986, 1–056(C) (Repl.1992) ("A summary judgment, interlocutory in character, may be rendered on the issue of liability alone although there is a genuine issue as to the amount of damages.").

## II. THE MERITS

### A. Article IV, Section 10, Bars State-funded Legislative Pensions

 The first version of Article IV, Section 10, appearing in the original New Mexico Constitution adopted in 1911, stated:

Each member of the legislature shall receive as compensation for his services the sum of five dollars for each day's attendance during each session and ten cents for each mile traveled in going to and returning from the seat of government by the usual traveled route, once each session, *and he shall receive no other compensation, perquisite or allowance.* (Emphasis added.)

Amendments in 1944, 1953, 1971, and 1982 have brought the provision to its present form.

The question before us is whether the words "compensation, perquisite or allowance," which have appeared in the provision since its inception, include pension plan benefits. In answering this question we recognize that statutes are presumed to be constitutional and "they will not be declared invalid unless the court is clearly satisfied that the legislature went outside the constitution in enacting them." *Richardson v. Carnegie Library Restaurant,* 107 N.M. 688, 693, 763 P.2d 1153, 1158 (1988) (Walters, J., plurality opinion).

We are "clearly satisfied" that state-funded pensions are barred by Article IV, Section 10. Compensation is "something given or received as an equivalent for services." *The Random House Dictionary of the American Language* 300 (1971). Benefits under the New Mexico legislative pension plan come within that definition. The calculation of benefits depends on a legislator's years of service. Legislators are unquestionably receiving payments in return for those years of service. The benefits cannot be gifts because Article IX, Section 14, declares: "[T]he state ... shall [not] directly or indirectly lend or pledge its credit, or make any donation to or in aid of any person...." *See State ex rel. Sena v. Trujillo,* 46 N.M. 361, 129 P.2d 329 (1942) (Article IX, Section 14, bars grant of pension to supreme court clerk who left state service prior to enactment of pension legislation); *cf. State ex rel. Hudgins v. Public Employees Retirement Bd.,* 58 N.M. 543, 273 P.2d 743 (1954) (beneficiary of voluntary state retirement plan has contractual relationship with State; contract modification requiring payment of consideration by retiree, even though probably beneficial to retiree, does not constitute prohibited gift or extra compensation).

In an almost identical context the Nebraska Supreme Court wrote:

We are unable to conceive how a retirement benefit awarded a former legislator for "creditable service" can be said not to be within one of the many meanings of either "pay" or "perquisites." Certainly the Legislature could not be making a gift of state money to its former members. The benefit can be nothing other than compensation for past services.

*State ex rel. Spire v. Public Employees Retirement Bd.,* 226 Neb. 176, 410 N.W.2d 463, 466 (1987). Other courts have also held that legislative pension plans provide compensation. *E.g., Chamber of Commerce v. Leone,* 75 N.J. 319, 382 A.2d 381 (1978) (upholding legislative pension plan because state constitution authorizes legislators to receive "compensation"), *aff'g* 141 N.J.Super. 114, 357 A.2d 311 (Ct.Ch.Div.1976); *Boryszewski v. Brydges,* 37 N.Y.2d 361, 372 N.Y.S.2d 623, 334 N.E.2d 579, 582–83 (1975) (same).

Moreover, the phrase "compensation, perquisite, or allowance" is so all-embracing as to establish that the provision was intended to prevent any enrichment whatsoever. The structure of the provision—first authorizing per diem payments and then barring any "*other* compensation, perquisite, or allowance"—conveys the same breadth of meaning. Inasmuch as the purpose of per diem payments is to reimburse for expenses, not to enrich, the indication that per diem payments would otherwise be barred as compensation, a perquisite, or an allowance unequivocally implies the sweeping reach of the constitutional prohibition.

### B. The Plan Participants' Contrary Arguments

The plan participants present three arguments against our analysis. One is histori-

cal; the other two concern the timing of receipt of pension benefits.

## 1. The Historical Argument

The plan participants argue that the constitutional language does not include pensions because the framers in 1911 would not have understood the terms "compensation, perquisite or allowance" to include pensions. They contend that at the time of the adoption of the provision there were no state pension plans in the United States and private pension plans were very rare. They point out that fifty-five percent of the adult working population were engaged in agriculture for their livelihood and few, if any, working people in New Mexico at this time had a pension.

In support of their argument the participants cite *Campbell v. Kelly,* 157 W.Va. 453, 202 S.E.2d 369 (1974). In that case the West Virginia Supreme Court interpreted an 1872 constitutional provision that said: " 'No other allowance or emolument than that by this section provided shall directly or indirectly be made or paid to the members of either house for postage, stationery, newspapers, or any other purpose whatever.' " *Id.* at 373 (emphasis deleted). Relying on historical information of the same nature as that provided by the plan participants here, the Court ruled that the constitutional prohibition did not encompass pensions.

To rebut this argument, the Attorney General presented affidavits by Myra Ellen Jenkins, former archivist for the State of New Mexico and then State Historian. According to Jenkins, many delegates to the 1910 New Mexico Constitutional Convention were well-educated and held college degrees; in 1906 the Atchison, Topeka and Santa Fe Railroad began its pension plan, which was available to New Mexico employees; one delegate was a conductor for the railway; the chairman of the convention, Charles A. Spiess, performed legal work for the railway; and at least one of the delegates, E.F. Stover, was a union veteran (military pensions had existed for some time). She expressed her opinion that at least some of the delegates knew about pensions and that "the delegates would have considered pensions and other forms of retirement plans to be compensation within the

meaning of the original constitutional provision."

Despite Jenkins' eminence as an historian, we do not rely on her testimony. To begin with, it is not clear to us that the meaning of the constitutional language is to be determined by the understanding of the framers and voters in 1911 rather than the framers of later amendments and the voters who approved them. In this regard we should emphasize at the outset that it is irrelevant that the electorate has rejected various proposed amendments to Article IV, Section 10, including amendments proposed in 1978 and 1988 specifically to authorize legislative pension plans funded in whole or in part by state funds. Under our system of government, law is not made by defeating bills or proposed constitutional amendments. Article XIX, § 1 (establishing procedure for amending constitution); *see* William D. Popkin, *Materials on Legislation: Political Language and the Political Process* § 15.04, at 579 (1993). If in 1987 legislative pension plans were permitted by Article IV, Section 10, the defeat of the 1988 proposed amendment did not change that. Change would have required *adoption* of a constitutional amendment to prohibit legislative pension plans.

It is another matter, however, to say that voter *approval* of amendments to Article IV, Section 10, could have no effect on the proper interpretation of language that appeared in the original version of the section. If the reenacted constitutional language had previously been authoritatively interpreted by New Mexico courts, we would ordinarily presume that the electorate was informed of that interpretation and intended to maintain it, just as we do when the legislature reenacts previously construed statutory language, *see Twin Mountain Rock v. Ramirez,* 117 N.M. 367, 370, 871 P.2d 1373, 1376 (Ct.App.), *cert. denied,* 117 N.M. 802, 877 P.2d 1105 (1994). But when, as in this case, there has been no previous construction of the language by the courts, it seems reasonable to interpret the language approved by the voters in accordance with the common meaning of the language at the time of the election. *See State ex rel. Spire,* 410 N.W.2d at 467 (relevant date for determining meaning of

constitutional language is 1934, the date of the initiative adopting the provisions at issue, rather than 1875, when the language was originally adopted). In particular, this approach may be appropriate when amendments to one part of a provision suggest a different meaning for parts that were left the same. *See Coslett v. Third St. Grocery,* 117 N.M. 727, 876 P.2d 656 (Ct.App.1994) (meaning of unchanged language in statute may be modified by amendment to other portions of statute); *cf. Morris v. Gonzales,* 91 N.M. 495, 497, 576 P.2d 755, 757 (1978) (noting rule of statutory construction that amendments which amount to reenactment in substantially the same language result in a continuation of the original statute, but not applying the rule to specific constitutional amendment at issue). The 1953 amendment to Article IV, Section 10, for example, changed "Each member of the legislature *shall receive as compensation for his services* the sum of ten dollars for each day's attendance" to "Each member of the legislature *shall receive as per diem expense....*" (Emphasis added.) Insofar as the amendment evidences discomfort with referring to per diem payments as "compensation," it indicates an intent to use an up-to-date meaning of "compensation" in Article IV, Section 10.

In any event, we need not choose between the understanding that the words "compensation, perquisite or allowance" would receive in 1911, 1944, 1953, 1971, or 1982. Even if the present language had been unaltered since 1911, we would hold that Article IV, Section 10, prohibits any public funding of legislative pensions.

The error of the plan participants is that they equate the 1911 meaning of a word with a list of all those things generally identified by the word in 1911. If pensions did not ordinarily come to mind in 1911 when one spoke of "compensation," then, in their view, pensions could never come within the 1911 meaning of the word. This is not the way we read the language of our laws. Consider an extreme case. When a statute uses the word "person," does it apply only to persons in existence on the statute's effective date? What of a "person" born a decade later?

Similarly, if a 1950 statute made it a crime to threaten someone with a "deadly weapon," would the statute necessarily exclude a threat with a laser gun developed in the year 2000?

The United States Supreme Court has addressed the issue repeatedly. In holding that patent law applies to human-made micro-organisms, the United States Supreme Court wrote, "This Court frequently has observed that a statute is not to be confined to the 'particular application[s] ... contemplated by the legislators.' *Barr v. United States,* 324 U.S. 83, 90 [65 S.Ct. 522, 525, 89 L.Ed. 765] (1945)." *Diamond v. Chakrabarty,* 447 U.S. 303, 315, 100 S.Ct. 2204, 2211, 65 L.Ed.2d 144 (1980).

Affirming a conviction for using a fraudulently obtained passport to establish the defendant's right to reenter this country from abroad, the Supreme Court explained:

The fact that at the time of the passage of the act, passports were not customarily used by citizens to assure easy reëntry is brought forward by petitioner to support the argument that Congress did not intend to punish uses such as the one charged here. There is nothing in the legislative history to indicate that Congress considered the question of use by returning citizens. Old crimes, however, may be committed under new conditions. Old laws apply to changed situations. The reach of the act is not sustained or opposed by the fact that it is sought to bring new situations under its terms. While a statute speaks from its enactment, even a criminal statute embraces everything which subsequently falls within its scope. The use here charged under these tests was clearly within the scope of the act. The purpose of this act was to punish the use of passports obtained by false statements.

*Browder v. United States,* 312 U.S. 335, 339–40, 61 S.Ct. 599, 602, 85 L.Ed. 862 (1941) (footnotes omitted).

Of particular interest is a decision from the Tenth Circuit Court of Appeals by former New Mexico Supreme Court Justice Sam Bratton. A New Mexico statute enacted in 1882 (and amended in 1931 only to increase the dollar amount of recovery authorized)

provided for damages for wrongful death caused by a "railroad, locomotive, car, stage coach, or other public conveyance." NMSA 1929, § 36–101. Holding that the statute encompassed death caused by a truck for hire, even though trucks had not existed in 1882, Judge Bratton wrote: "[I]t is a general rule in the construction of statutes that legislative enactments in general and comprehensive terms, and prospective in operation, apply to persons, subjects and businesses within their general purview and scope, though coming into existence after their passage, where the language fairly includes them." *Cain v. Bowlby*, 114 F.2d 519, 522 (10th Cir.), *cert. denied*, 311 U.S. 710, 61 S.Ct. 319, 35 L.Ed. 462 (1940); *Gaiser v. Buck*, 203 Ind. 9, 179 N.E. 1, 4 (1931) ("[T]he language of a Constitution (or statute) is generally extended to include new things and new conditions of the same class as those specified which were not known or contemplated when it was adopted."). *See generally* 2B Norman J. Singer, *Sutherland Statutory Construction* § 49.02 (5th ed. 1992).

This approach is particularly appropriate when interpreting constitutional provisions. We quote from several opinions of the United States Supreme Court.

[W]e are now concerned with the question whether the right to choose at a primary election, a candidate for election as representative, is embraced in the right to choose representatives secured by Article I, § 2. We may assume that the framers of the Constitution in adopting that section, did not have specifically in mind the selection and elimination of candidates for Congress by the direct primary any more than they contemplated the application of the commerce clause to interstate telephone, telegraph and wireless communication, which are concededly within it. But in determining whether a provision of the Constitution applies to a new subject matter, it is of little significance that it is one with which the framers were not familiar. For in setting up an enduring framework of government they undertook to carry out for the indefinite future and in all the vicissitudes of the changing affairs of men, those fundamental purposes which the instrument itself discloses.

*United States v. Classic*, 313 U.S. 299, 315–16, 61 S.Ct. 1031, 1038, 85 L.Ed. 1368, *reh'g denied*, 314 U.S. 707, 62 S.Ct. 51, 86 L.Ed. 565 (1941).

[W]hile the meaning of constitutional guaranties never varies, the scope of their application must expand or contract to meet the new and different conditions which are constantly coming within the field of their operation. In a changing world, it is impossible that it should be otherwise.... [A] degree of elasticity is thus imparted, not to the *meaning*, but to the *application* of constitutional principles[.]

*Village of Euclid v. Ambler Realty Co.*, 272 U.S. 365, 387, 47 S.Ct. 114, 118, 71 L.Ed. 303 (1926) (applying Fourteenth Amendment due process clause to building zone laws, which began in the United States in the twentieth century).

[A]lthough the present case involves the right to service in a restaurant, the fundamental principles of the Fourteenth Amendment apply with equal force to other places of public accommodation and amusement. Claims so important as those presented here cannot be dismissed by asserting that the Fourteenth Amendment, while clearly addressed to inns and public conveyances, did not contemplate lunch counters and soda fountains.

*Bell v. Maryland*, 378 U.S. 226, 315, 84 S.Ct. 1814, 1863, 12 L.Ed.2d 822 (1964) (Goldberg, J., concurring).

Although a state constitution may not be so grand a charter as that authored by our nation's founders, it is nonetheless intended to govern an indefinite future and must be interpreted accordingly. As the Indiana Supreme Court wrote in an oft-quoted passage:

A Constitution is an instrument of a practical nature, made and adopted by the people themselves, adapted to common wants and designed for common use. When words are used therein which have both a restricted and general meaning, the general must prevail over the restricted unless the nature of the subject-matter o[r]

the context clearly indicates that the limited sense was intended.

*Gaiser,* 179 N.E. at 3–4.

New Mexico has embraced this view. In *Wylie Bros. Contracting Co. v. Albuquerque–Bernalillo County Air Quality Control Board,* 80 N.M. 633, 639, 459 P.2d 159, 165 (Ct.App.1969), we wrote:

> A constitution is a practical instrument adapted to common wants and designed for common use, and it is made and adopted by the people themselves. It must be construed as if intended to stand for. a great length of time. Since it is an instrument of progress, its meaning should not be too narrowly or literally interpreted, but rather it should be given a meaning which will be consistent with new or changed conditions as they arise. If words are used therein that have both a restricted and a general meaning, the general must prevail, unless the context clearly indicates that the restricted meaning was intended. *Flaska v. State,* [51 N.M. 13, 177 P.2d 174 (1946) ].

*See Humana of New Mexico v. Board of County Comm'rs,* 92 N.M. 34, 582 P.2d 806 (1978).

In *State ex rel. Anaya* our Supreme Court rejected an argument of the same nature as that presented here by the plan participants. A former state senator had been appointed as a district judge. The question was whether the appointment was prohibited by New Mexico Constitution Article IV, Section 28, which read in pertinent part:

> "No member of the legislature shall, during the term for which he was elected, be appointed to any civil office in the state, nor shall he within one year thereafter be appointed to any civil office created, or the emoluments of which were increased during such term...."

*Id.* at 245, 539 P.2d at 1007. The salary of district judges had been raised during the appointee's prior term in the senate. The appointee contended that the provision restricting appointment to offices whose emoluments had been increased was not intended to apply to district judges because when Article IV, Section 28, was adopted, the Constitution set the salaries for district judges—

the legislature had no power to increase judicial salaries. The Court rejected the argument, saying that it would not search for hidden meanings and nuances in the clear language of the Constitution. *Id.* at 249, 539 P.2d at 1011. We follow the same approach in this case. The restrictive use of history by *Campbell* is an aberration which we find unpersuasive. *See State ex rel. Spire,* 410 N.W.2d at 467 (rejecting *Campbell* ).

From the perspective of these cases, it follows that it is irrelevant to our interpretation of Article IV, Section 10, whether pensions were used as a benefit of employment in 1911. It might be relevant if the definition of, say, "compensation" in 1911 differed from the present definition: "something given or received as an equivalent for services." *The Random House Dictionary of the American Language* 300 (1971). But the plan participants have not suggested that a 1911 lexicographer would have rejected the current definition. The 1913 dictionary we consulted provides a modern definition, defining compensation as "That which is given or received as an equivalent, as for services...." *The Century Dictionary* 1144 (1913).

Moreover, the precise definitions of the words *compensation, perquisite,* and *allowance* (if such words can have precise definitions) are not as important as the message conveyed by the three words in the context of the entire section. "[I]rrespective of whether the ... framers of the ... Constitution contemplated pensions, they clearly stated that legislators were to receive nothing other than the sums specified in the Constitution." *State ex rel. Spire,* 410 N.W.2d at 467. The historical argument does not alter our conclusion that the language of Article IV, Section 10, unequivocally prohibits state-subsidized pensions for legislators.

## 2. Timing Arguments

■ In addition to presenting the historical argument, the plan participants contend in essence that pension payments do not come within the constitutional prohibition because of their timing.

First, they argue that the prohibition in Article IV, Section 10, applies only to pay-

ments received during the legislator's term of office. They note that Sections 5, 6, 7, 8, 9, 11, 12, 13, and 14 of Article IV all refer only to legislative sessions; Article IV, Section 28, prohibits the appointment of legislators to certain offices only if the emoluments of the office were increased during the legislator's term; and the prohibition in Article IV, Section 37, against members of the legislature using railroad passes implicitly applies only during the legislator's term of office. They infer that in general Article IV governs only matters occurring during the legislator's term of office.

We are not persuaded. Article IV is entitled "Legislative Department." It is not surprising that an article on the legislature speaks primarily to events occurring during legislative sessions. When, however, the purpose of a section would be eviscerated by restricting it temporally, the limited scope of other provisions is immaterial. The plan participants' argument proves too much. Under their interpretation of Article IV, Section 10, the legislature could enact a statute awarding each member a substantial stipend beginning on the January 1 after the member leaves office. Permitting such stipends would emasculate Article IV, Section 10. For any payment prohibited by Article IV, Section 10, during the term of office, the legislature could establish a functionally equivalent post-term payment. Deferring payment accomplishes nothing of substance. Neither the language nor the purpose of Article IV, Section 10, suggests that it applies only to compensation, perquisites, or allowances received during the term of office.

The plan participants' second argument regarding timing is simply that the pension payments are too indirect, attenuated, remote, and uncertain to be prohibited by Article IV, Section 10. They rely on several state court decisions in support. Most are readily distinguishable on their facts, and all but one are distinguishable in that they interpret constitutional provisions similar to New Mexico's Article IV, Section 28, not Article IV, Section 10.

The leading "remoteness" decision is *State ex rel. Todd v. Reeves*, 196 Wash. 145, 82 P.2d 173 (1938). A state senator serving a term from January 1937 to January 1941 decided to run for a judgeship in 1938. The 1937 legislature had enacted a retirement plan for judges. The state constitution provided: " 'No member of the legislature during the term for which he is elected shall be appointed or elected to any civil office in the state which shall have been created; or the emoluments of which shall have been increased, during the term for which he was elected.' " *Id.* at 176 (emphasis deleted). The court noted that no benefit would vest in the plan until the senator had served as a judge for at least ten years. Thus, he would have to be reelected in 1944 before he could receive any pension. No increase in emoluments would be effective during his first term on the court. Given the purpose of the constitutional provision, it was reasonable to hold that the benefit was too remote. Even so, three of the nine justices dissented. *See State ex rel. O'Connell v. Dubuque*, 68 Wash.2d 553, 413 P.2d 972 (1966) (en banc) (salary increase for legislators effective at beginning of next term does not prohibit legislators from seeking reelection).

In *Bulgo v. Enomoto*, 50 Haw. 61, 430 P.2d 327 (1967), the court considered a constitutional provision essentially the same as the Washington one. The question was whether a legislator could serve as a county official when the legislature had passed a statute providing that every public officer or employee who was eligible for workers' compensation benefits could receive the difference between the regular salary and temporary disability compensation under the compensation law, provided that the officer or employee had enough accumulated sick leave allowance from which the difference could be deducted. The court found the benefit too remote and contingent to be disqualifying because it would be available only to an employee who had suffered temporary disabling injury and had accumulated sufficient sick leave allowance.

In *State ex rel. Lyons v. Guy*, 107 N.W.2d 211 (N.D.1961), the question was whether a legislator could run for governor. The pertinent statute (1) increased from $4200 to $4800 the portion of the governor's salary upon which social security assessments were

levied and (2) increased by one-half percent the rate of contribution to be paid by the state. The court noted that any increase in benefits derived from such coverage would come from federal and not state law and the contributions by the state were in the amount required by federal law. *Id.* at 218–19. The court ruled that the additional payments by the state (which did not go directly to the governor) were too remote and contingent to bar the legislator from seeking the governorship.

In *State ex rel. Johnson v. Nye,* 148 Wis. 659, 135 N.W. 126 (1912), the alleged increase in emoluments was for the office of grain commissioner. The pay had been $200 per month, of which $100 would be payable out of the state treasury and $100 would come from funds collected by the commission after all other legal obligations had been fully paid. Legislation changed the method of payment of the $200 monthly salary so that all of the salary was to be paid out of funds collected by the commission (without a restriction that all other legal obligations be fully paid first). The contention was that the change increased the emoluments of the office by making payment of the salary more secure and certain. The court rejected the claim.

In all the above cases the benefit to be received by the former legislator could reasonably be termed "remote." The one case bearing a closer factual resemblance to the case on appeal is *Brown v. Meyer,* 787 S.W.2d 42 (Tex.1990). The legislature increased the pay of district judges. Under prior legislation, retirement benefits for elected officials were indexed to the salaries of district judges. The court majority nevertheless permitted a legislator to run for the office of attorney general. The court may have been influenced by the fact that the specific legislation at issue did not directly address pension benefits for elected officials. The statute at issue in our case, by contrast, addresses nothing but pension benefits for legislators. (We also note that, according to the dissent, the majority of the court rendered its decision on the same day that the application for writ of error was filed. *Id.* at 50.)

In any event, there is one ground upon which *Brown* is readily distinguishable from the present appeal. This ground is shared by all of the remoteness decisions just discussed. Each decision addressed a constitutional provision similar to Article IV, Section 28, not Article IV, Section 10. The two provisions are distinct in two important respects.

First, provisions like Article IV, Section 28, create a prohibition on public service. They therefore encounter a contrary public policy in favor of opportunity in seeking public office. Thus, the Texas Supreme Court wrote that "constitutional provisions which restrict the right to hold public office should be strictly construed against ineligibility." *Brown,* 787 S.W.2d at 45; *accord, e.g., State ex rel. O'Connell,* 413 P.2d at 980. This proposition has particular force when the former legislator cannot assume the new office without the approval of the electorate, as in *Brown, Reeves, Bulgo,* and *Guy.*

Second, the purpose of provisions like Article IV, Section 28, is to remove an incentive legislators may have to increase the pay of another public office. If a legislator can assume an office promptly after increasing the pay for the office, the legislator will have an improper motivation for increasing the pay. *See State ex rel. Anaya,* 88 N.M. at 250, 539 P.2d at 1012. Yet, the force of the improper motivation decreases as the likelihood of enjoying the benefit decreases. Indeed, these constitutional provisions recognize this by restricting the assumption of the other office for only a limited period of time—in New Mexico, through one year after expiration of the legislator's term of office. Thus, the notion of "remoteness" is incorporated into the very terms of the provision.

In contrast, Article IV, Section 10, has no such limitation. It speaks in the broadest terms. Moreover, even if remoteness is a consideration under Article IV, Section 10, the test for remoteness should be different from the remoteness test under Article IV, Section 28. The important consideration under Article IV, Section 28, is whether the prospect of assuming a particular civil office would motivate a legislator to vote for a particular increase in the benefits of the of-

fice. The important consideration under Article IV, Section 10, is whether the legislature is enriching its members. Thus, the remoteness test under Article IV, Section 28, should look to the impact of the benefit on the motivation of a single legislator, whereas the remoteness test under Article IV, Section 10, should look to simply the benefit to the members of the legislature as a whole. The two tests may yield different results when applied to the same benefit. What may be a remote and contingent prospect for one person may be a virtual certainty for the group. For example, there may be doubt regarding whether a particular legislator will receive a pension payment, but there is no doubt that the pension statute will benefit some legislators and that state money will need to be expended to finance legislative pensions. In short, remoteness cases under provisions like Article IV, Section 28, may well be irrelevant to analysis under Article IV, Section 10.

There remains to discuss the decision in *Campbell*, which interpreted a provision similar to Article IV, Section 10. Article VI, Section 33, of the West Virginia Constitution, enacted in 1872, had stated, " 'No other allowance or emolument than that by this section provided shall directly or indirectly be made or paid to the members of either house for postage, stationery, newspapers, or any other purpose whatever.' " 202 S.E.2d at 373 (emphasis deleted). After construing the language as not including pensions, the court quoted several remoteness cases as supporting the result. *Campbell*, however, did not adopt the view that pensions are too remote a benefit to be banned by all such constitutional provisions. The Court clearly confined its holding to the historical terms "allowance or emolument." In construing the 1971 version of Article VI, Section 33, the Court ruled that the "modern and broadened word 'compensation' " encompasses pension programs. *Id.* at 377–78. In other words, the benefits of pension plans are not so remote that pension plans would be exempt from "modern" constitutional restrictions on compensation. Thus, our disagreement with *Campbell* is not with respect to the remoteness argument; our disagreement concerns the historical argument discussed above in Section II(B)(1) of this opinion.

Having carefully considered the authorities cited by the plan participants, we are not dissuaded from agreeing with the Nebraska Supreme Court that for purposes of Article IV, Section 10, "[t]here is nothing imponderable and contingent about paying a specified monthly allowance such as is contemplated by the plan before us." *State ex rel. Spire*, 410 N.W.2d at 467.

## III. CONCLUSION

We hold that a state-financed pension plan for legislators is prohibited by the New Mexico Constitution. We therefore reverse the district court's order. We remand for further proceedings regarding the claim for repayment of benefits received.

**IT IS SO ORDERED.**

BIVINS and PICKARD, JJ., concur.