BIG ISLAND SMALL RANCHERS ASSOCIATION, ET
AL., Plaintiffs-Appellants, *v.* STATE OF HAWAII, ET
AL., Defendants-Appellees

NO. 6073

DECEMBER 22, 1978

RICHARDSON, C.J., KOBAYASHI, OGATA
AND MENOR, JJ., AND CIRCUIT JUDGE LUM
IN PLACE OF KIDWELL, J., RECUSED

OPINION OF THE COURT BY KOBAYASHI, J.

This is an appeal by plaintiffs, Big Island Small Ranchers
Association (BISRA), an unincorporated association, Ernest
Deluz, Robert Jose, Masato Kawamoto, Merle Toledo, Ernest
Pung and Gilbert Motta,[1] (collectively appellants) from a
judgment filed by the circuit court of the third circuit dismiss-
ing appellants' complaint and granting summary judgment

---

[1] Ernest Texeira, William Ramos, Abraham S. Ramos, John J. Andrade, Jon S.
Ramos, Edward V. Souza and Ernest S. Ramos were named plaintiffs in the com-
plaint but were permitted to be dropped as parties in an order filed by the court on
December 4, 1975.

for defendants-appellees, the State of Hawaii, the State Department of Land and Natural Resources (Department), the State Board of Land and Natural Resources (Board), Christopher Cobb, Chairman of the Board (hereinafter collectively referred to as the State); and Richard Smart, dba Parker Ranch, Kukaiau Ranch, Inc., C. Brewer and Company, Ltd.[2] (Richard Smart, dba Parker Ranch, Kukaiau Ranch, Inc., and C. Brewer and Company, Ltd., are hereinafter referred to as Ranches.) The complaint filed by appellants on August 26, 1975, sought declaratory and/or injunctive relief; an accounting; relief in the nature of mandamus; money damages; and ancillary and additional relief arising under Article X, Section 5 of the Constitution of the State of Hawaii, Chapters 480, 171, 632 and 91, Hawaii Revised Statutes, and Rule 65, H.R.C.P.[3] We affirm.

## ISSUE

Whether or not the trial court erred in dismissing appellants' complaint for failure to state a claim upon which relief can be granted and in granting appellees' motion for summary judgment.

## STATEMENT OF THE CASE

Appellees Department and the Board, both state administrative agencies, voted to auction to qualified bidders certain parcels of state owned land totalling 42,802.42 acres for lease. The lots or parcels to be auctioned were in the same configurations and sizes as previously established when the state agencies leased the parcels to various lessees approximately

---

[2] Theo. H. Davies, Inc., was a named defendant in the complaint filed by plaintiff-appellants, but did not enter an appearance below.

[3] The parties subsequently, in a stipulation filed with the circuit court on October 22, 1975, deleted from the complaint the paragraph praying for money damages.

21 years ago, which leasehold interests expired on December 21, 1972. The parcels ranged in size from 135 to 7,932 acres, were designated for use as pasture land and were to be leased for a period of 35 years, commencing March 1, 1976. A description of each of the parcels, its location, size and upset rental price per annum was contained in a document entitled "Notice of Sale" issued by the Department and Board on August 5, 1975. Also issued was a "Conduct of Sale" document, containing provisions for the qualification of bidders, the determination of successful bidders, the duties of successful bidders, and the effect of sale. A "Special Notice to Bidders" document listing the responsibilities of the lessee, the conditions of lease, and rights reserved to the State and to third parties was issued on the same day.

A public auction was scheduled to take place on August 28, 1975, in Hilo, Hawaii.

In the complaint, the appellants alleged that appellee Ranches had held leases to virtually all of the land at issue for approximately 21 years terminating December 21, 1972, and since that date had continued to hold and utilize the lands on revokable permits issued by the State. Appellants further alleged that the lots or parcels of such unchanged configurations and sizes and in such increased terms of years were unlawful and void for the following reasons:

1. Such action violated the mandate of Article X, Section 5, of the Constitution of the State of Hawaii.

2. Such action violated the provisions of Chapter 480, Hawaii Revised Statutes, in that it would perpetuate, continue and exacerbate anticompetitive, monopolistic, and oligarchic concentration and control of the beef cattle industry in the country and State of Hawaii.

3. Such action was null and void in that the Department and Board had failed to promulgate and file their rules and regulations as mandated by Chapter 91, Hawaii Revised Statutes, Hawaii Administrative Procedure Act (HAPA):

    a. The Department and Board had failed to promulgate rules and regulations containing criteria as to how the size of real estate parcels to be leased was to be determined;

 b. The Department and Board had failed to provide for water development in the management of the lands therein;

 c. The Department and Board had failed to subdivide the lands at issue into minimum economic units;

 d. The Department and Board had failed to establish a general plan determining best use of the real property at issue.

The appellants sought below:

1. A judgment declaring that the Department and Board's actions were unlawful;

2. A judgment enjoining the Department and Board from auctioning and leasing the real properties in the sizes and configurations as contemplated, and enjoining the Ranches from leasing the same;

3. An accounting as to the disposition, if any, of the remaining acreage available for leases;

4. A judgment enjoining the Ranches from violating the provisions of HRS § 480-13(2);

5. A judgment in the nature of mandamus, compelling the Department and Board to dispose of the subject lands in conformity with Article X, Section 5 of the Constitution of the State of Hawaii;

6. A decree continuing jurisdiction over this action and mandating that the Department and Board render a report and accounting to the court as to the progress and actions in complying with the decree and mandates of the court;

7. Alternatively and cumulatively, as to the Ranches, in the event of a lease of the lands at issue to the Ranches, a judgment declaring the same null and void, for cancellation thereof and for further disposition consistent with the appellants' rights;

8. A judgment for reasonable attorneys' fees and costs.

All of the defendants answered the complaint or entered an appearance with the exception of Theo. H. Davies, Inc.

On October 7, 1975, appellee Richard Smart dba Parker Ranch moved to dismiss the complaint for failure to state a claim upon which relief can be granted, or for summary

judgment. Appellee Smart argued: (1) that Article X, Section 5 of the Hawaii Constitution did not apply to leases of public lands; (2) that the Board acted within its statutory powers which did not constitute rule making under the HAPA, and appellants may not seek review of the Board's action in the courts; (3) the action of the Board was pursuant to legislative authorization and within its exclusive jurisdiction; and (4) that appellant BISRA had no standing to seek judicial review of the action and suffered no damage. Attached to the motion was an affidavit signed by J. Garner Anthony, counsel for appellee Smart, stating that he had attended the public auction of leases of pasture land and that Richard Smart had failed to obtain a new lease on three of the eleven parcels he had previously leased.

On October 15, 1975, the State moved for dismissal of the complaint for failure to state a claim or for summary judgment. The State argued: (1) that the court lacked jurisdiction over the State on the ground that the State had not consented to be sued nor waived its immunity from suit; (2) that appellant BISRA had no standing to challenge the action of the Board; (3) that the action of the Board was an exercise of its discretionary and proprietary functions in implementing the statutory provisions of Chapter 171, Hawaii Revised Statutes, and that the Board's action did not constitute either rule making or adjudication of a contested case within the meaning of Chapter 91, Hawaii Revised Statutes; (4) the appellants had failed to establish that they were entitled to injunctive relief because they had not showed that they will suffer pecuniary injuries or that they had been denied their legal rights, that they would prevail in a hearing on the merits; and because they had failed to pursue their administrative remedies; (5) that Chapter 480, Hawaii Revised Statutes, was inapplicable to the State; (6) that relief in the nature of mandamus was unavailable since appellants had failed to carry the burden of showing that the State had a duty to act and refused to do so, and that the State's action was arbitrary, capricious and constituted an abuse of discretion. Attached to the memorandum was an affidavit signed by Christopher Cobb stating that: (1) a public auction was held on August 28,

1975, for the sale of government pasture leases and that this was a result of four years of planning and studies by the Department; (2) in accordance with chapter 171, the Board authorized the auction of 42,802.42 acres of government pasture leases on the Island of Hawaii; (3) based on the studies of the lands and the recommendation of the Department, the Board approved the sale at public auction of 42,802.42 acres for pasture purposes in the size and configuration and under the terms and conditions as stated in the Notice of Sale, the Special Notice to Bidders, and the general lease documents; (4) that the remaining lands were not authorized for sale pending further studies by the Department; (5) that he was present at the public auction and Mr. Ernest Deluz [one of the appellants] actively participated in the bidding at the public auction.

Appellants filed a Memorandum of Authorities on October 22, 1975. Attached thereto was an affidavit signed by counsel for appellants stating that he had observed the public auction and heard James Detor of the Department warn bidders that appellants had initiated a lawsuit seeking to invalidate the auction and to have the leases declared unlawful.

On October 23, 1975,[4] the court filed an order which stated the following:

> The above case having come on for hearing before the undersigned on the motions of defendants to dismiss or for summary judgment, based on affidavits and memoranda in support of the motions, pursuant to Rule 12(b) and Rule 56, HRCP, . . . and the Court having heard argument of the attorneys for plaintiffs and for defendants and having found that the complaint fails to state a claim for relief and that the facts are undisputed
>
> NOW THEREFORE IT IS ORDERED that Defendants' motions are granted; that the complaint be dismissed and that judgment be entered in favor of defendants.

---

[4] The transcript of the hearing was not made part of the record on appeal.

234

The written judgment was entered on November 3, 1975, decreeing that the complaint be dismissed.

ISSUE

WHETHER OR NOT THE TRIAL COURT ERRED IN DISMISSING APPELLANTS' COMPLAINT FOR FAILURE TO STATE A CLAIM UPON WHICH RELIEF CAN BE GRANTED AND IN GRANTING APPELLEES' MOTION FOR SUMMARY JUDGMENT

Rule 12(b)(6), H.R.C.P., provides in pertinent part:

Every defense, in law or fact, to a claim for relief in any pleading . . . shall be asserted in the responsive pleading thereto if one is required, except that the following defenses may at the option of the pleader be made by motion: . . . (6) failure to state a claim upon which relief can be granted. . . . If, on a motion asserting the defense numbered (6) to dismiss for failure of the pleading to state a claim upon which relief can be granted, matters outside the pleading are presented to and not excluded by the court, the motion shall be treated as one for summary judgment and disposed of as provided in Rule 56, . . . .

The controlling question before this court is whether the pleadings, affidavits and any other matters on record, if any, show that there is no genuine issue as to any material fact, *Baldeviso v. Thompson*, 54 Haw. 125, 127-28, 504 P.2d 1217, 1220 (1972), and whether the appellees are entitled to judgment as a matter of law. *Gum v. Nakamura*, 57 Haw. 39, 42, 549 P.2d 471, 474 (1976).

In reviewing the facts pleaded by the appellants in their complaint and taking into consideration the affidavits filed by counsels for the respective parties, we find that there is no genuine issue as to any of the material facts.

However, the appellants seek to have the sale of leases by the State declared invalid on several theories. First, appellants claim that the auction of the lots or parcels by the State "of such unchanged configurations and sizes and in such increased term of years was unlawful" because such action was in violation of Article X, Section 5 of the Hawaii Constitution. We find that Section 5 is not applicable to leases of

public pasture lands.

Article X, Section 5 of the Hawaii Constitution provides:

The public lands shall be used for the development of farm and home ownership on as widespread a basis as possible, in accordance with procedures and limitations prescribed by law.

The language of this section refers expressly to farm and home *ownership* and not leaseholds. Further, the committee reports of the 1950 Constitutional Convention of Hawaii relative to this section fail to support any contrary interpretation. Standing Committee Report No. 78, adopted by the Committee of the Whole, in Proceedings of the Constitutional Convention of Hawaii 1950, volume I, stated the following, at 233:

The Committee unanimously agreed that for the public good, *fee simple* homes and farms should be made available on as widespread basis as possible, however, it was felt by the Committee that reasonable judgment should be exercised in the manner of making the lands available. . . . The thought of the Committee is that the more families are placed as independent land *owners* on the public domain, the more stable the economy of the State will be. . . . (Emphasis added.)

Temporary dispositions of State lands by the sale of leases and licenses were discussed by the Committee, but the Committee felt that such matters were best left to further study by the legislature. Regarding the use of public lands by single corporations, the Committee report stated:

[T]he Committee discussed the matter of breaking up large tracts of public land now being operated by a single corporation which is providing livelihood for many citizens of the State. The partial subdivision of such a tract, if improperly made, might destroy the corporation and the jobs created by it without benefit to the homesteaders themselves, . . . . The Committee felt that these are problems as to which the legislature should be cautioned, it being the intent of this section that the legislature shall develop a sound plan before putting this section into execution.

*Id.* at 234. Appellants' claim that the actions of the State violated the mandates of the Hawaii Constitution is without merit.

Appellants' second theory is that the actions of the State and appellee Ranches violated the provisions of Chapter 480, Hawaii Revised Statutes. To this charge the State has raised the defense of sovereign immunity.

The provisions of Chapter 480, Hawaii Revised Statutes, relate to the regulation of the conduct of trade and commerce in the State (Act 190, S.L.H. 1961). In *A. C. Chock, Ltd. v. Kaneshiro,* 51 Haw. 87, 89, 451 P.2d 809, 811 (1969), we said: "[I]t is a general principle of law that statutory laws of general application are not applicable to the State unless the legislature in the enactment of such laws made them explicitly applicable to the State." Further, we have expressly recognized that the doctrine of sovereign immunity precludes any suit against the State without the State's express consent. *Helela v. State,* 49 Haw. 365, 369, 418 P.2d 482, 485 (1966). Since the legislature has not made Chapter 480 explicitly applicable to the State, and since none of the allegations in the complaint claim that the State has consented to be sued upon this chapter, appellants can claim no right to relief under this theory.

As to appellee Ranches, appellants' complaint fails to allege any acts or conduct by the appellee Ranches which would constitute a violation of Chapter 480. Even if all the Ranches had answered and had admitted to having bid and obtained pasture leases, this would not, of itself, constitute a violation of the provisions of the Statute. Appellants fail to specify which, if any, of the provisions of Chapter 480 have been violated. Hence, as to appellee Ranches, any claim based on this theory fails to state a cause of action sufficient for granting relief.

A third theory advanced by the appellants is that the action of the State in auctioning public pasture land leases was null and void because the Department and Board had failed to promulgate and file their rules and regulations as mandated by Chapter 91, Hawaii Revised Statutes. We find no substance to this claim.

The provisions of Chapter 171, Hawaii Revised Statutes, govern the management and disposition of public lands by the Department and the Board, and circumscribe, in detail, the disposition of such lands. When this chapter was initially passed in 1962 as Act 32, the committee report stated as follows:

> The purpose of this bill is to provide a set of laws for the administration of the Department of Land and Natural Resources and for the management and disposition of the public lands of our State. . . .

> Your Committee believes that this bill . . . incorporates a sound policy for the administration, management, and disposition of the public lands of the State. Every consideration has been given throughout the bill, particularly in the disposition sections, to adequately *preserve the assets of the State* by authorizing only leases disposable only by public auction. . . . The provision for disposition only in economic units was incorporated throughout the bill to assure the individual a fair opportunity to compete in the bidding and purchasing of lots. The provision for disposition only of single specific uses was incorporated so that the *State may benefit* from a widely diversified utilization of its land. (Emphasis added.)

(SCR No. 240, H.B. 244). The overall purpose of this chapter, and particularly of those sections dealing with the lease of public lands, was to preserve the assets of the State and to provide guidelines to the Department and Board in the management of these assets. It was not the intent of the legislature to create rights in the public to use State lands.

HRS § 171-33 expressly mandates that the Board shall, prior to any notice of intended disposition of land:

> (1) Classify the land according to its use or uses as provided in this chapter;

> (2) Determine the specific use or uses for which the disposition is intended;

> (3) Parcel land into units of minimum size areas related to the intended specific use or uses and sufficient for an economic operation, hereinafter called an "economic

unit'';

　·　(4) Determine the requirements for the construction of building or other improvements, which are necessary or desirable to encourage the highest use of the land;

　(5) Determine the upset price or lease rental, based upon the fair market value of the land employed to the specific use or uses for which the disposition is being made, with due consideration for all of the terms and conditions of the disposition;

　(6) Determine the necessary conditions of disposition which will discourage speculation;

　(7) In the case of leases, determine the minimum tenure necessary to support the intended use or uses and the necessity for periodic rent openings in long-term leases to assure the State a fair return;

　(8) Prepare the proposed documents and make them available for public inspection;

　(9) Determine, two years before the expiration of the term of any lease, whether premises are to be demised for the same use or uses under a new lease or whether all or any part thereof is to be reserved for other use or uses and then promptly notify the lessee of the determination.

HRS § 171-34 further provides that, if the intended disposition of land is for intensive agricultural or pasture uses, the Board must make an on-site inspection of the land, secure data from the land study bureau, and prepare a written report on the land.

Appellants do not claim that the Department or Board violated any of the mandates of sections 171-33 or 34. Appellants merely disagree that the size designations made by the Board in regard to the parcels of pasture land auctioned on August 28, 1975, constituted "minimum size unit" as stated in HRS § 171-33(3). Absent a showing that the lot sizes were "[un]related to the intended specific use or uses" and were "[in]sufficient for an economic operation", we cannot say that the Board abused its discretion in setting the parcel sizes.

The Board is empowered to promulgate rules and regula-

tions pursuant to HRS § 171-6(4).[5] However, there is no statutory requirement that the Board specifically promulgate rules relative to the determination of parcel sizes for leasing, or for water development in the management of lands.

Additionally, the appellants argue that the Department and Board have failed to establish a general plan to determine the best use of the property at issue. No provision of Chapter 171 requires the Department or Board to do so. HRS § 171-33(1) mandates that the Board "classify the land according to its use or uses as provided for in this chapter." The specific use classifications of land have been determined by the legislature and are found in HRS § 171-10. Appellants do not argue that the classification of 42,802.42 acres of land was unreasonable or in violation of these statutory provisions.

Appellants argue further that the State's conduct, generally, in auctioning public lands for lease as pasture land constituted "rulemaking" within the meaning of Chapter 91.[6] We disagree.

Standing Committee Report No. 8, H.B. 5, Act 103, commenting on agency actions which come within the "internal management" exception to the rulemaking procedures of Chapter 91, stated:

It is intended by this definition of "rule" that regulations and policy prescribed and used by an agency principally directed to its staff and its operations are excluded from the definition. In this connection, your Committee considers . . . *the custodial management of the property of*

---

[5] HRS § 171-6(4) provides that the Board may:
(4) Promulgate rules and regulations, which rules and regulations, upon compliance with chapter 91, shall have the force and effect of law. . . .

[6] HRS § 91-1(4) defines "Rule" as follows:
"Rule" means each agency statement of general or particular applicability and future effect that implements, interprets, or prescribes law or policy, or describes the organization, procedure, or practice requirements of any agency. The term does not include regulations concerning only the internal management of an agency and not affecting private rights of or procedures available to the public, nor does the term include declaratory rulings issued pursuant to section 91-8, nor intra-agency memoranda.

*the state or county or any agency* primarily a matter of "internal management" as used in this definition.

In our opinion, the conduct of the State in this case comes within the "custodial management of . . . property" exception to Chapter 91. Furthermore, the documents entitled Notice of Sale, Conduct of Sale, and Special Notice to Bidders, contain provisions which are either clearly mandated by statute or directly related and consistent thereto.

In view of our foregoing conclusions, it is unnecessary for us to decide the questions of whether appellant BISRA has standing, as an unincorporated association, to bring this suit, or whether the appellants are estopped from claiming injury in light of our holding in the case of *Munoz v. Commissioner of Public Lands*, 40 Haw. 675 (1955).

Judgment affirmed.

*Steven K. Christensen and Paul Mark Clark* for plaintiffs-appellants.

*Edwin P. Watson,* Deputy Attorney General, for defendants-appellees, State of Hawaii, et al.

*Dennis O'Connor (J. Garner Anthony* on the brief; *Anthony, Hoddick, Reinwald & O'Connor* of counsel) for defendant-appellee Richard Smart.

STATE OF HAWAII, Plaintiff-Appellant, *v.* OTIS PETE BELL, Defendant-Appellee

NO. 6315

STATE OF HAWAII, Plaintiff-Appellant, *v.* DAVID ERNEST HISAW, Defendant-Appellee

NO. 6540

STATE OF HAWAII, Plaintiff-Appellant, *v.* MITCHELL G. CHANG, also known as Sonny, Defendant-Appellee

NO. 6910

DECEMBER 26, 1978

RICHARDSON, C.J., KOBAYASHI, OGATA, MENOR AND KIDWELL, JJ.

242

OPINION OF THE COURT BY OGATA, J.

These three consolidated appeals present the same under-lying question: whether the prosecution is required to present to the grand jury evidence which tends to negate the guilt of the accused.

In the three cases before us, indictments were returned by the Oahu Grand Jury against each of the defendants. The defendants thereafter moved for dismissal of the indictments on the ground that evidence tending to negate their guilt was not presented by the prosecution to the grand jury. In Cases No. 6315 and 6540, Circuit Judge Doi dismissed the indictments without prejudice, while in Case No. 6910, Circuit Judge Lanham dismissed the indictment with prejudice. The State has appealed.

We reverse the dismissals of these three indictments. In our opinion, the prosecution is required only to present to the grand jury evidence which is clearly exculpatory in nature. Our holding will be explained and developed more fully as each of the three cases is described and analyzed indivi-dually.

I.    NO. 6315 — STATE v. BELL

In No. 6315, defendant Otis Pete Bell was indicted by the grand jury on charges of murder and carrying a firearm with-out a permit or license.

At the grand jury hearing, Michael O'Connell identified Bell as the person who shot and killed the victim, Calvin Silva. O'Connell stated, however, that he did not actually see Bell holding the gun because the victim was seated between Bell and O'Connell. O'Connell testified that he saw Bell approach the victim from behind, at which time O'Connell

heard gunshots and saw the victim immediately fall to the floor.

Honolulu Police Officer Michael Sensano testified at the grand jury hearing that while responding to a police radio report of the shooting, he spotted Bell walking in the vicinity of the murder scene. Sensano ordered Bell, who was holding an object in his hand, to stop, but Bell put the object into his pocket and fled. Bell was apprehended shortly thereafter by another police officer. The object recovered from Bell's pocket was found to be a pistol.

At a preliminary hearing held prior to the grand jury hearing, Michael Nash testified as a witness for the defense. Nash, who was present at the murder scene, testified that Bell was not the person who had shot Calvin Silva. Nash acknowledged at that hearing, however, that he had been under the influence of intoxicants at the time of the shooting and had been unable to give the police a specific and accurate account of the incident. The district court found Nash's testimony to be unreliable for purposes of the preliminary hearing, and it committed Bell to the circuit court to answer the charges.

Bell contends that the prosecution has a duty to present all material and relevant exculpatory evidence of which it is aware to the grand jury. He argues that the prosecution's purposeful failure to present Michael Nash as a witness at the grand jury hearing constitutes a fatal flaw in the indictment process, thus necessitating the dismissal of the indictment returned against him. The circuit court agreed with his contention and dismissed the indictment.

Initially, we note that the grand jury's responsibilities include both the determination of whether there is probable cause to believe that a crime has been committed and the protection of citizens against unfounded criminal prosecutions. *United States v. Calandra*, 414 U.S. 338, 343 (1974). We do not believe, however, that the fulfillment of these responsibilities requires that the grand jury have before it any and all evidence which might tend to exculpate the defendant.

As stated in *United States v. Calandra, supra*, at 343-44:
A grand jury proceeding is not an adversary hearing in

which the guilt or innocence of the accused is adjudicated. Rather, it is an *ex parte* investigation to determine whether a crime has been committed and whether criminal proceedings should be instituted against any person.

To require the prosecutor to present any and all information which may have a tendency to exculpate the accused would, in our view, confer upon grand jury proceedings the adversary nature which is more properly reserved for the actual trial phase of prosecution. *See United States v. Kennedy,* 564 F.2d 1329, 1338 (9th Cir. 1977), *cert. denied,* 435 U.S. 944 (1978).

Similar concerns have been expressed in M. Frankel and G. Naftalis, The Grand Jury 71 (1977):

The rationale for not insisting on "defense" evidence is again related to presenting adversary proceedings in the grand jury room. In addition, determining what is or is not or may be exculpatory is often difficult. Evidence that does not appear to be terribly meaningful to a prosecutor preparing to present a case to the grand jury may take on altogether different significance when viewed from the standpoint of the defense counsel at trial. It might place an unmanageable burden on the prosecutor at this stage to require him to discern and disclose possible matters of exculpation.

The same authority has cited additional difficulties which may arise when an adversarial character is bestowed upon grand jury proceedings:

The preliminary rehearsal of a trial in the grand jury room, but with counsel for only one side, entails dangers, or at least dubieties. Prospective defense witnesses may have their stories warped or colored unfairly in the grand jury room. It may be doubted that the average defense counsel would desire such an *ex parte* "rehearsal" of people he plans to call. Moreover, it is difficult enough as things stand to control the popular notion that a person indicted "must be guilty of something." The task is made more manageable by being able to remind trial jurors that the grand jury heard only the prosecutor's side. One may question the effects of a general understanding, however

much a distortion, that the grand jury actually heard both sides.

*Id.* at 129-30.[1]

We therefore do not think that to require all exculpatory evidence to be presented to the grand jury is, on balance, a requirement that will be of great benefit.

The difficulties cited above, however, do not arise where evidence of a *clearly* exculpatory nature is involved. We would require, therefore, that where evidence of a clearly exculpatory nature is known to the prosecution, such evidence must be presented to the grand jury. *See United States v. Mandel*, 415 F.Supp. 1033, 1042 (D. Maryland 1976). Clearly exculpatory evidence may be manifested, for example, by a witness whose testimony is not directly contradicted by any other witness and who maintains that the accused was nowhere near the scene of the crime when it occurred. Also, where it has become apparent to the prosecution, for example, that a sole eyewitness testifying as to the perpetration of the crime has perjured himself before the grand jury, that perjury must be revealed to the grand jury. The failure of the prosecutor to present such clearly exculpatory evidence to the grand jury would justify dismissal of the indictment. *See id.*

The federal courts have recognized that the prosecution is necessarily given wide discretion in presenting its case to the grand jury and that the prosecution is thus not required to present all exculpatory evidence to the grand jury. *United States v. Y. Hata & Co.*, 535 F.2d 508, 512 (9th Cir.), *cert. denied*, 429 U.S. 828 (1976); *see United States v. Narciso*, 446 F.Supp. 252, 296 (E.D. Mich. 1977); *United States v. Mandel*,

---

[1] A further discussion of the difficulties which can arise from the requirement that all evidence tending to negate guilt must be presented to the grand jury appears in Note, *The Prosecutor's Duty to Present Exculpatory Evidence to an Indicting Grand Jury*, 75 Mich. L. Rev. 1514, 1535-36 (1977), which is an article favoring implementation of the rule requiring presentation of exculpatory evidence.

The root of these difficulties lies in the inherently contradictory role which the prosecutor is asked to fulfill before the grand jury, thus making it unrealistic to expect that he will never attempt to select or present evidence which will favor his view of the case. *See id.* at 1535.

*supra* at 1040-42. Under the rule which defendant Bell espouses, the defense in every instance would be able to argue that certain evidence is exculpatory in nature and should be presented to the grand jury. Such a procedure would unnecessarily impinge on the prosecution's broad discretion and would inject confusion and delay into the grand jury indictment process.

Moreover, in our view, a defendant's right to due process would not be impinged where the prosecution is not required to present all exculpatory evidence to the grand jury. As stated, the grand jury phase is devoted only to a preliminary determination of whether criminal proceedings should be instituted against any person. The full trial phase — with its attendant evidentiary and procedural restrictions — still remains the actual adjudicatory stage of the guilt or innocence of the accused. As the court of appeals in *Hata, supra*, made clear:

> [T]he greatest safeguard to the liberty of the accused is the petit jury and the rules governing its determination of a defendant's guilt or innocence.

535 F.2d at 512. The ex parte nature of the grand jury is based upon "an abiding confidence in the jury trial system", *id.*, and we thus perceive no due process infirmity in continuing to afford the prosecution considerable latitude in determining whether to present evidence of an arguably exculpatory nature to the grand jury.

Defendant Bell's reliance upon *Johnson v. Superior Court*, 15 Cal. 3d 248, 539 P.2d 792, 124 Cal. Rptr. 32 (1975), is not persuasive. The California Supreme Court held in *Johnson* that the prosecutor is obligated to present to the grand jury all evidence of which the prosecutor is aware which reasonably tends to negate guilt.

However, the decision in *Johnson* was explicitly based on statutory grounds,[2] and the court in that case thus declined to

---

consider the defendant's due process argument. In addition, by requiring the presentation to the grand jury of evidence "tending to negate guilt", the court in *Johnson* apparently utilized the language of the ABA Standards, *The Prosecution Function* § 3.6(b) (1971), which provides:

> The prosecutor should disclose to the grand jury any evidence which he knows will tend to negate guilt.

We decline to adopt the ABA approach for the same reasons enunciated in *United States v. Mandel, supra.* The court in *Mandel* seriously questioned whether it could in all instances be determined what evidence is sufficient to "negate guilt". The court went on to state:

415 F. Supp. at 1041-42.

In the instant case, Michael Nash's testimony that Bell was not the person who shot Calvin Silva arguably tended to negate Bell's guilt. However, Nash's testimony was not *clearly* exculpatory because one witness, Michael O'Connell, gave testimony which was directly contradictory to that of Nash. Furthermore, Nash himself added a colorable tinge to his own testimony by acknowledging that he was under the influence of intoxicants and was consequently unable to furnish the police with accurate and detailed information as to the events which had taken place. Under these circumstances, Nash's testimony was not clearly exculpatory, and the prosecutor was not required to present Nash's testimony

---

evidence within its reach will explain away the charge, it shall order the evidence to be produced, and for that purpose may require the district attorney to issue process for the witnesses.