CHÁVEZ, Justice, dissenting. {92} The Land Commissioner is not simply an auctioneer charged with the responsibility to sell public trust lands. The Commissioner is a trustee of public lands with fiduciary responsibilities to preserve, protect, and manage trust lands so as to make the lands productive for the benefit of the trust beneficiaries to whom he owes an undivided loyalty. The majority has eliminated a seldom used, but occasionally necessary and effective land management strategy available to the Land Commissioner, which can increase the value of the trust corpus and make management of the property more efficient and economical, thereby maximizing the benefit to the trust beneficiaries. Constraining the Land Commissioner’s fiduciary responsibilities and the exercise of his discretion exceeds the limits of our power to issue writs of mandamus, and is detrimental to the interests of the trust lands’ beneficiaries. Therefore, I respectfully dissent. {93} This Court has repeatedly observed that the writ of mandamus is an extraordinary remedy to be reserved for extraordinary circumstances. To ensure that the writ issues only in extraordinary circumstances, since before statehood this Court has required (1) that a party seeking issuance have no other adequate means to attain the desired relief, and (2) the duty sought to be enforced is clear and indisputable. Regents of Agric. Coll. v. Vaughn, 12 N.M. 333, 342-43, 78 P. 51, 53 (1904). Other adequate means do exist to challenge the land exchanges at issue, including the remedy provided for in the Enabling Act. N.M. Territorial Laws & Treaties, Enabling Act for New Mexico (Act of June 20, 1910, 36 Stat. 557, ch. 310) (“the Enabling Act”). In addition, as is evident from the briefs filed by both the parties and Amici, the Land Commissioner’s duty not to exchange trust lands for more valuable and productive lands is neither clear nor indisputable. On the contrary, land exchanges that (1) substantially conform to the requirements of the Enabling Act, (2) are consistent with the best interests of the beneficiaries, and (3) comport with the rules adopted by the Land Commissioner are permissible. {94} This mandamus proceeding is also inappropriate because whether the subject land exchanges satisfy these criteria requires the development of a factual reeord. The Commissioner has asserted that the subject land exchanges have increased the value of the trust corpus by $13,000,000 and have met his objectives to (1) improve boundary distinction for trust lands; (2) consolidate holdings so that the State would own 43,000 contiguous acres (25,000 contiguous on the east side of White Peak and 18,000 contiguous on the west side of White Peak); (3) facilitate effective land management strategies; (4) mitigate trespass, vandalism, theft, illegal vehicle use, and poaching; (5) create a quality game and wildlife area; (6) improve existing roads and construct new, all-weather roads to provide safe access; (7) close unnecessary roads to conserve wildlife habitat; (8) develop campgrounds and facilities for hunters and recreational users; (9) implement forest restoration programs to improve forest health and wildlife habitat. Whether the exchanges did in fact increase the value of the trust corpus and meet objectives that are consistent with the best interests of the trust beneficiaries requires the development of facts. Therefore, those with standing who believe these exchanges are inconsistent with the Land Commissioner’s fiduciary obligations may sue in a court of general jurisdiction to void any exchange which does not substantially conform with the requirements of the Enabling Act. I. MANDAMUS IS APPROPRIATE ONLY WHEN THE DUTY AT ISSUE IS CLEAR AND INDISPUTABLE {95} Although a writ of prohibition cannot lie against a state official, see State ex rel. Bird v. Apodaca, 91 N.M. 279, 281-82, 573 P.2d 213, 215-16 (1977) (“Prohibition, by its very nature, will not lie against state officers.”), mandamus can be used in a prohibitory manner to prohibit unlawful or unconstitutional official action. See Kiddy v. Bd. of Cnty. Comm’rs of Eddy Cnty., 57 N.M. 145, 152, 255 P.2d 678, 683 (1953) (“Public functionaries may be restrained by mandamus from doing what they know is an illegal act.”). In considering whether to issue a prohibitory mandamus, we do not assess the wisdom of the public official’s act, we determine whether that act goes beyond the bounds established by the New Mexico Constitution. State ex rel. Clark v. Johnson, 120 N.M. 562, 570, 904 P.2d 11, 19 (1995). {96} The Constitution and laws of New Mexico define the limits of authority for each branch of government. In 1904, the limits of our authority to issue a writ of mandamus were defined by the Territorial Supreme Court when it wrote “[i]t is said by the highest judicial tribunal in the land that, ‘mandamus lies to compel the performance of a statutory duty only when it is clear and indisputable.’ ” Vaughn, 12 N.M. at 342-43, 78 P. at 53 (quoting Bayard v. United States ex rel. White, 127 U.S. 246, 250, 8 S.Ct. 1223, 32 L.Ed. 116 (1888)). We have never abandoned the requirement of a clear and indisputable duty as essential for the issuance of a writ of mandamus. Johnson v. Vigil-Giron, 2006-NMSC-051, ¶ 22, 140 N.M. 667, 146 P.3d 312. Instead, because it is such an extraordinary writ that must be issued only in extraordinary circumstances, we have carefully defined its limits. Mandamus is a drastic remedy to be invoked only in extraordinary circumstances. The writ shall not issue in any case where there is a plain, speedy and adequate remedy in the ordinary course of law. It shall issue on the information of the party beneficially interested. [A] writ of mandamus is available only to one who has a clear legal right to the performance sought; it is available only in limited circumstances to achieve limited purposes. State ex rel. Coll v. Johnson, 1999-NMSC-036, ¶ 12, 128 N.M. 154, 990 P.2d 1277 (internal quotation marks and citations omitted). While mandamus will not lie to correct or control the judgment or discretion of a public officer in matters committed to his care in the ordinary discharge of his duties, it is nevertheless well established that mandamus will lie to compel the performance of mere ministerial acts or duties imposed by law upon a public officer to do a particular act or thing upon the existence of certain facts or conditions being shown, even though the officer be required to exercise judgment before acting. State ex rel. Four Corners Exploration Co. v. Walker, 60 N.M. 459, 463, 292 P.2d 329, 331-32 (1956) (citations omitted). “A ministerial act is an act which an officer performs under a given state of facts, in a prescribed manner, in obedience to a mandate of legal authority, without regard to the exercise of his own judgment upon the propriety of the act being done.” State ex rel. Perea v. Bd. of Comm’rs of De Baca Cnty., 25 N.M. 338, 340, 182 P. 865, 866 (1919). Therefore, our jurisprudence instructs that before we are empowered to issue a writ of mandamus, (1) the boundaries of the duty at issue must be clear and indisputable, (2) the public official must not have discretion in the performance of the duty, and (3) there must not exist another plain, speedy, and adequate remedy in the ordinary course of law. {97} In this case, despite notice to the public as required by the Land Commissioner’s rules, 19.2.21.9(D) NMAC, only one bid was received, and no members of the public objected to the bid process. The Attorney General has not filed this mandamus proceeding on behalf of any specific beneficiary who contends that the Land Commissioner breached his fiduciary duty to them by engaging in the subject land exchanges. The Attorney General does not contend that the Land Commissioner failed to comply with the Enabling Act’s public notice requirements; failed to open the bidding to all members of the public; engaged in an exchange of trust lands for a value that was less than the true appraised value of the trust lands; or that the exchange will not serve the best interests of the trust beneficiaries by making management of the trust corpus more efficient and economical. Instead, the Attorney General contends that the Land Commissioner did not comply with the public auction requirements because the Commissioner required competing bidders to offer, at a minimum, land with at least the same value as the trust land, and only for all of the trust land the Commissioner proposed to dispose of. These bid requirements, argues the Attorney General, substantially constrained the public auction to achieve a predetermined result. In other words, the Attorney General wants this Court to hold that the Land Commissioner must allow a bidder to bid for trust land in cash, land, other items of value or a combination thereof, and the bidder may also bid on a portion of the land being offered at auction. {98} Thus, the question before us is whether the Land Commissioner has a clear and indisputable duty to allow bidders to offer any and all forms of consideration and on any portion of the land the Commissioner seeks to dispose of in a public auction. As will be discussed, this duty is not clear and indisputable. The Land Commissioner has the discretion to establish the terms of the auction that are in the best interests of the trust beneficiaries. In addition, there are adequate remedies, including the remedy given in Section 10 of the Enabling Act, that authorize an action to enforce the provisions of the Enabling Act and render null and void any “sale, lease, conveyance or contract of or concerning any of the [trust] lands” which are not made in “substantial conformity with the provisions of [the Enabling] act.” Enabling Act § 10. {99} Despite the Attorney General’s narrow complaints, the majority has raised its own concerns with the auction process and would preclude the Land Commissioner from having any discussions with a potential bidder before the auction and from considering any criteria other than financial criteria. I do not agree that such discussions are precluded. Instead, such discussions will aid the Land Commissioner in defining the best interests of the trust beneficiaries, thus defining a bid’s minimum requirements. Any member of the public is still invited to meet or exceed the minimum bid requirement. The Land Commissioner may still be called to answer whether such a bid exceeded the true appraised value of the trust land and whether the bid was in the trust beneficiaries’ best interests. When evaluating which is the highest and best bid that is consistent with the trust beneficiaries’ best interests, immediate revenue is not the only consideration. II. FIDUCIARY DUTIES OF THE LAND COMMISSIONER {100} New Mexico Constitution Article XIII, Section 2 delegates to the commissioner of public lands the responsibility to “select, locate, classify and have the direction, control, care and disposition of all public lands, under the provisions of the acts of congress relating thereto and such regulations as may be provided by law.”[6] To carry out these constitutional responsibilities, the Legislature empowered the Commissioner to “make rules and regulations for the control, management, disposition, lease and sale of state lands.” NMSA 1978, § 19-1-2 (1953). See also State ex rel. Otto v. Field, 31 N.M. 120, 133, 241 P. 1027, 1032 (1925) (“The commissioner was given ample power to make rules and regulations ‘for the control, management, disposition, lease and sale of state lands.’ ”). On August 5,1992, the Land Commissioner adopted State Land Office Rule 21, which specifically addresses land exchanges. 19.2.21 NMAC (recodified 12/13/02). The Commissioner is also authorized by statute to “execute and authenticate for the state all deeds, leases, contracts or other instruments affecting” state lands. Section 19-1-2. {101} The New Mexico Enabling Act declares that all lands granted to the State of New Mexico are to be held in trust. 36 Stat. 557, Sec. 10 (1910). “[T]he emergence of the trust concept was originally initiated by the states,” and Congress influenced by these practices, “incorporated trust language into the last enabling act that created the states of New Mexico and Arizona.” Sean E. O’Day, School Trust Lands: The Land Manager’s Dilemma Between Educational Funding and Environmental Conservation, a Hobson’s Choice?, 8 N.Y.U. Envtl. L.J. 163, 184 (1999) (footnotes omitted). The trust concept arose because although some trust land was lost due to incompetence or corruption, most of the land was lost because states regularly chose to rapidly sell the lands for the purpose of funding schools. Sally K. Fairfax, et al., School Trust Lands: A Fresh Look at Conventional Wisdom, 22 Envtl. L. 797, 807 (1992). However, states began to recognize that liquidating trust lands would make sustaining a continuing source of funding difficult. O’Day, supra, at 182. As a result, the trend in the states shifted from dissipating the trust lands they had been granted by the federal government to retaining those lands. Id. at 181. One consequence of this gradual and implicit evolution toward land retention is that the states continue to have a choice regarding whether to sell or retain the lands. Even today, like the federal government, the states continue to engage in land sales and exchanges. Hence, the shift to retention does not imply that no state trust lands will ever be sold, but rather that the presumption is in favor of retaining rather than disposing of the lands. Fairfax, supra, at 824 & 824 n. 93 (footnotes omitted) (“State trust land managers tend to maintain a portfolio of lands for investment and management purposes.... All states except California engage in land exchanges to block in their scattered sections. Oregon and Arizona have moved particularly effectively in this direction.”). {102} New Mexico has interpreted the trust language in the Enabling Act as creating a charitable trust with the beneficiaries comprised of the citizens of New Mexico. Forest Guardians v. Powell, 2001-NMCA-028, ¶¶ 9-10, 130 N.M. 368, 24 P.3d 803. However, the Land Commissioner’s undivided loyalty is to the designated beneficiaries and not the State as a whole. State ex rel. Shepard v. Mechem, 56 N.M. 762, 770, 250 P.2d 897, 902 (1952) (funds from lands granted by the Enabling Act may not be used to defray general government expenses). In Ervien v. United States, 251 U.S. 41, 48, 40 S.Ct. 75, 64 L.Ed. 128 (1919), the United States Supreme Court held that the New Mexico Land Commissioner could not expend money derived from the sale of trust lands to promote the state. The Court reasoned that “[t]here is in the Enabling Act a specific enumeration of the purposes for which the lands were granted and the enumeration is necessarily exclusive of any other purpose.” Id. at 47, 40 S.Ct. 75; see also Lassen v. Arizona ex rel. Arizona Highway Dep’t, 385 U.S. 458, 468, 87 S.Ct. 584, 17 L.Ed.2d 515 (1967) (“the purposes of Congress require that the Act’s designated beneficiaries ‘derive the full benefit’ of the grant” (citation and footnote omitted)); Cnty. of Skamania v. State, 102 Wash.2d 127, 685 P.2d 576, 580 (1984) (en banc) (“A trustee must act with undivided loyalty to the trust beneficiaries, to the exclusion of all other interests.”). The beneficiaries of the trust lands at issue are identified as the public schools in New Mexico, New Mexico State University, Las Vegas Medical Center, New Mexico Military Institute, New Mexico Tech, New Mexico School for the Deaf, the State Penitentiary, Miners’ Colfax Medical Center, the School for the Blind, and charitable and penal reform. {103} The Commissioner is subject to the same fiduciary obligations as any private trustee. Cnty. of Skamania, 685 P.2d at 580. “All powers of trusteeship are held in the trustee’s fiduciary capacity and must be exercised in good faith and to serve the interests of the beneficiaries.” Restatement (Third) of Trusts § 86, cmt. b (2007). A trustee’s duties include the protection and management of the trust property to provide returns or other benefits to the trust, id. §76; duty of prudence, id. § 77; and loyalty, id. § 78. To carry out these duties, the Commissioner must decide whether it is better for the trust beneficiary to sell the lands and invest the receipts or retain and manage the lands. When the Commissioner retains and manages trust lands, he must also be concerned about the allocation of personnel and management resources to make the land productive, maintain fences and roads, prevent overgrazing, control soil erosion, minimize trespass damage and the risk of fires, and enhance wildlife habitat, among other duties. The benefit to the trust is maximizing revenues and profits while minimizing the costs incurred to manage the px-operty. Accordingly, the Commissioner should have the flexibility to manage the land in a manner that enhances the opportunity for the largest retuxm consistent with the beneficiaries’ objectives. The objectives of the beneficiaries can hardly be said to be the consumption of the entire trust corpus. {104} The flexibility required to manage the land necessarily calls for the exercise of discretion consistent with the terms and pux'pose of the trust or as required by the exercise of the trustee’s fiduciary duties. Id. § 87. A coux’t should not interfere with a trustee’s exercise of a discretionary power when that exercise is reasonable and consistent with the trust purposes and the txmstee’s fiduciary duties. Id. The purpose of the Enabling Act is to prevent the sale of land at unreasonably low prices. Lassen, 385 U.S. at 464, 87 S.Ct. 584. Indeed, written into Section 10 of the Enabling Act is the requirement that no sale or other disposal of trust property be made for a consideration less than the true appraised value of the trust property. Id. Thus, one of the express purposes of the Enabling Act is to obtain the fair market value of the property being sold. Branson Sch. Dist. RE-82 v. Romer, 161 F.3d 619, 637 (10th Cir.1998). {105} We have held that the Land Commissioner has broad discretion to decide the policy question of how he or she will offer trust lands for sale and the quantity of land to sell. Stovall v. Vesely, 38 N.M. 415, 418-19, 34 P.2d 862, 864-65 (1934) (citing Field, 31 N.M. at 149-50, 241 P. at 1039). “It seems to us that this language is in accord with our view that, under the Enabling Act, Constitution, and statutes of New Mexico, the commissioner may sell or hold the state lands as his judgment and discretion may dictate, and that he may exercise ‘entire discretion as to the time of selling these lands and the extent to which they should be sold,’ and that no one has the right to compel the commissioner to sell the lands in its [sic] entirety or otherwise, and that, if he elects to sell the land otherwise than in its entirety, he is within his jurisdiction to do so. To hold otherwise would lead to an absurd result. * * * As we have seen, the commissioner was given almost unlimited power with respect to the public lands owned by the state ‘except as may be otherwise specifically provided by law.’ * * * Nowhex'e in the statute is any provision made for any supervisory control over the acts of the commissioner excepting in the case of contest concerning lands when an appeal may be taken from the decision of the commissioner to the district court. He is responsible alone to the electorate for any lack of proper business capacity or any misdoings in office.” Id. at 419, 34 P.2d at 864-65 (quoting Field, 31 N.M. at 150-56, 241 P. at 1039-41). {106} The Field Court’s interpretation of the broad discretion enjoyed by the Commissioner is consistent with that of other jurisdictions. See Campana v. Arizona State Land Dep’t, 176 Ariz. 288, 860 P.2d 1341, 1344 (App.1993) (land commissioner can establish the terms of sale that are in the trust’s best interests and has discretion as to how to structure the proposed sale); Pike v. State Bd. of Land Comm’rs, 19 Idaho 268, 113 P. 447, 454-55 (1911) (commissioner did not abuse discretion in advertising for auction 24,000 acres of land without allowing bids for smaller parcels); Big Island Small Ranchers Ass’n v. State, 60 Haw. 228, 588 P.2d 430, 437 (1978) (commissioner did not abuse his discretion by auctioning 42,000 acres of land at one time). In addition, when a power is granted by statute, everything necessary to carry out the power will be implied. Kennecott Copper Corp. v. Emp’t Sec. Comm’n, 78 N.M. 398, 402, 432 P.2d 109, 113 (1967). This Court has held that the general power granted to the Land Commissioner should not be limited by implication unless its exercise would interfere with, frustrate, or to some extent defeat the purpose for which the power was granted. Field, 31 N.M. at 154, 241 P. at 1041 (internal quotation marks and citation omitted). III. ALL PARTIES AND AMICI AGREE THAT THE ENABLING ACT DOES NOT EXPRESSLY PRECLUDE LAND EXCHANGES {107} Section 10 of the Enabling Act does impose upon the Commissioner certain nondiseretionary obligations. The trust lands must be appraised at their true value, the money or other things of value obtained from the disposition of the lands must be used for specified purposes, and the consideration received must at least equal the true appraised value of the trust lands. Section 10 also imposes certain duties on the Commissioner with respect to the sale or lease of trust lands. The lands must be sold at a public auction to the highest and best bidder, with specific requirements for public notice of the auction. There must also be a true value appraisal of the lands and the lands cannot be sold for less than the appraised value or the minimum price fixed in the Enabling Act. 36 Stat. 557, § 10 (1910). However, none of the restrictions in the Enabling Act expressly or implicitly forbid the Commissioner or the State from exchanging land. Indeed, the parties to this case and Amici do not contend that the Enabling Act imposes a clear and indisputable duty on the State not to exchange trust lands. {108} On the contrary, the Attorney General himself states that “[n]either the Enabling Act nor other authorities expressly provide for or prohibit the acceptance of land as consideration in a sale of State Trust Lands.” In fact, the Attorney General issued two competing opinions on this subject, one in 1988 suggesting that a land exchange was not permissible, and a second one overruling that opinion in 1991, making it clear that land exchanges are permissible. In his 1991 opinion, the Attorney General stated “[t]he authority of the Commissioner to ‘dispose’ of public lands granted by the New Mexico Constitution and, with restrictions, by the Enabling Act includes the power to exchange public lands.” N.M. Att’y Gen. Op. 91-15 (1991), overruling N.M. Att’y Gen. Op. 88-35 (1988). The Attorney General conceded as much during oral argument. He was asked, “Are you saying that the Commissioner cannot exchange for land, period?” His response was an unequivocal “No, absolutely not.” Expanding on .the discussion, the Attorney General stated “Our position is that there’s a limited, narrow authority to do land exchanges under existing law, and that authority exists in those cases where you can hold a meaningful public auction.” Regarding whether the current Attorney General agreed with the Attorney General who wrote the 1991 opinion, during oral argument the present Attorney General said that he “fundamentally agreed with the conclusions of that opinion.” The Attorney General also did not challenge the Commissioner’s authority to accept public or private land in exchange for trust lands. {109} Amicus Curiae New Mexico School for the Blind, relying on the Enabling Act, the New Mexico Constitution, and New Mexico case law, argues that exchanges are clearly permitted. Amicus Curiae University of New Mexico, relying on the Enabling Act and standard rules of statutory construction, argues that the plain language of the Enabling Act authorizes land exchanges. Amicus Curiae Easter Seals and Union Pacific Railroad Company also conclude that the Enabling Act does not forbid land exchanges. Amicus Curiae New Mexico Wildlife Federation and the National Wildlife Federation do not argue that the Enabling Act clearly and indisputably forbids land exchanges; they simply urge this Court not to address the legality of land exchanges between the Commissioner and state or federal governmental entities. This suggested approach is not helpful because the Enabling Act does not distinguish between the disposition of trust lands to private or public parties. The only reference to the exchange of lands from the federal government is in the last paragraph of Section 10, where an exchange of state land for consideration of less than or equal to the appraised value of the state land is permissible. This would imply that other land exchanges are permissible so long as they are for consideration equal to or greater than the appraised value of the state land. IV. THE ENABLING ACT ALLOWS LAND EXCHANGES {110} However, there is other language in Section 10 that can reasonably be interpreted to allow land exchanges. The second paragraph of Section 10 provides, in part, that [disposition of any of said lands, or of any money or thing of value directly or indirectly derived therefrom, for any object other than that for which such particular lands, or the lands from which such money or thing of value shall have been derived, were granted or confirmed, or in any manner contrary to the provisions of this act, shall be deemed a breach of trust. (Emphasis added.) A “thing of value” derived from the disposition of land could quite clearly encompass land received in consideration for the disposition of the trust lands. The inclusion of money in the sentence also implies that consideration other than money may be accepted in the disposition of land. {111} This last point is corroborated in the fourth paragraph of Section 10, which reads in part: “All lands, leaseholds, timber and other products of land before being offered shall be appraised at their true value, and no sale or other disposal thereof shall be made for a consideration less than the value so ascertained.” Two observations can be made about this language. First, the language pertains to the “sale or other disposal” of lands, leaseholds, timber and other products. Second, the language refers to “consideration,” not just money. In Field, 31 N.M. at 144, 241 P. at 1037, this Court acknowledged the obvious-the expression “dispose of’ is not synonymous with the word “sell.” It will be noted under the provisions of our Constitution the lands may be held or disposed of. In the language of the Supreme Court of the United States.... The expression “to dispose of’ is very broad, and signifies more than “to sell.” Selling is but one mode of disposing of property____And again, it is said that, when a contract respecting property contains an agreement to be performed by the owner of it when he shall “dispose of’ or “sell” it, it is obvious that the words “dispose of’ are not synonymous with the word “sell”; and their meaning must be determined by considering the remainder of the contract. Id. (internal quotation marks and citations omitted). {112} Although the majority concludes that the phrase “disposal thereof’ refers to “leasehold,” Maj. Op. ¶ 38, the seventh paragraph of Section 10 suggests that the Commissioner may do more than sell or lease the land. The seventh paragraph reads, in pertinent part: “Every sale, lease, conveyance or contract of or concerning any of the lands hereby granted or confirmed, or the use thereof or the natural products thereof, not made in substantial conformity with the provisions of this act shall be null and void.” (Emphasis added.) If the Commissioner were limited to selling or leasing trust property, then why would Congress refer to other conveyances or contracts concerning the trust properties? Why would the Legislature mandate the Commissioner to “make rules and regulations for the control, management, disposition, lease and sale of state lands” and authorize the Commissioner to “execute and authenticate for the state all deeds, leases, contracts or other instruments affecting such lands”? Section 19-1-2 (emphasis added). Why would the New Mexico Constitution specify that the Commissioner “shall select, locate, classify and have the direction, control, care and disposition of all public lands”? N.M. Const, art. XIII, § 2. We do not interpret statutes in a way that renders language superfluous. Lion’s Gate Water v. D’Antonio, 2009-NMSC-057, ¶ 29, 147 N.M. 523, 226 P.3d 622. V. THE COMMISSIONER’S PUBLIC NOTICE AND PUBLIC AUCTION REQUIREMENTS FOR A LAND EXCHANGE SUBSTANTIALLY CONFORM WITH THE PROVISIONS OF THE ENABLING ACT {113} I am of the opinion that the Enabling Act may be reasonably construed to allow land exchanges, provided that (1) the exchange is for land with a value at least equal to the value of the trust lands, and (2) the exchange is consistent with the best interests of the trust beneficiaries. I am also of the opinion that the exchange may take place without a public auction, since the third paragraph of Section 10 reads “lands shall not be sold or leased ... to the highest and best bidder at a public auction,” not “lands shall not be - sold, leased or otherwise disposed of... to the highest and best bidder at a public auction.” Nevertheless, the Commissioner’s rules pertaining to land exchanges closely follow the sale requirements in the Enabling Act. Specifically, the rules require an appraisal of the true value of the lands proposed for exchange and public notice, and the public at large is invited to submit competing proposals. 19.2.21.8(C) NMAC; 19.2.21.9(D) NMAC. A competitive selection process for land exchanges is required. 19.2.21.2 NMAC. {114} The specific questions raised by the Attorney General in his petition for writ of mandamus are whether the subject land exchanges comply with the public auction requirement when the Commissioner required bids composed of land with a value equal to the true fair market value of the trust lands and also required bidders to bid on all of the trust lands being offered. The questions raised by the Attorney General are answered by Field and Vesely. In those cases, we made it clear that “no one has the right to compel the commissioner to sell the lands in its [sic] entirety or otherwise, and that, if he elects to sell the land otherwise than in its entirety, he is within his jurisdiction to do so.” Field, 31 N.M. at 151, 241 P. at 1039; Stovall, 38 N.M. at 418-19, 34 P.2d at 864-65. Just as the Commissioner may decide when to sell or how much land to sell, he or she is the one to decide the terms and conditions that would be in the best interests of the trust beneficiaries. [I]t may not be doubted that the Legislature of 1912, in creating the state land office, intended that the commissioner should exercise the power theretofore reposed in the commissioner of public lands to use his discretion in making deeds, contracts, and grants upon such terms and conditions as he may deem for the best interests of the state. Field, 31 N.M. at 164, 241 P. at 1044. {115} In this ease, the Commissioner offered a specified quantity of trust lands for land with a value at least equal to the true appraised value of the trust lands. However, a bidder was not precluded from offering a cash bonus. I fail to understand why we would yield to the Attorney General’s demand when it is the Land Commissioner who has the fiduciary duty regarding our trust lands. The Attorney General seeks to protect the best interests of the bidders, not the best interests of the trust beneficiaries. {116} The majority raise concerns in addition to those expressed by the Attorney General. The majority conclude that it is not a public auction if the Commissioner has prepublic auction discussions with a bidder and the Commissioner is limited to accepting the greatest financial return when deciding what is the “highest and best bid.” Instead of analyzing the Commissioner’s duties through the lens of his fiduciary responsibilities to the trust beneficiaries, the majority analyze his responsibilities as if he or she were simply an auctioneer. {117} When scrutinized through the lens of the Commissioner’s fiduciary obligations, the Commissioner has discretion to enter into pre-auction discussions and to determine which is the highest and best bid. The Commissioner has established a detailed procedure for land exchanges in Rule 19.2.21.8(A) NMAC with the “best interests of the trust” the watchword. The Commissioner may have “preliminary informal discussions or other preliminary communications with potential exchange applicants prior to any exchange application or exchange proposal being submitted and prior to any publication soliciting exchange proposals.” 19.2.21.9(A) NMAC. Only after an application is filed and “the commissioner determines that the proposed exchange appears to offer sufficient benefit to the trust and an advertisement soliciting proposals for the exchange has not already been published, the commissioner shall cause an advertisement soliciting further exchange proposals to be published.” 19.2.21.9(B)(6) NMAC. Within a reasonable time after the published closing date, the Commissioner “may select the proposal or proposals he determines are the highest and best, that is, the proposal or proposals that he believes will be most beneficial to the trust in accordance with the standards set forth in Subsections A and C of 19.2.21.8 NMAC above, and reject the rest.” 19.2.21.10(A) NMAC. He is not obligated to accept the proposal of the party who initially applied for the land exchange. Instead, the initial land exchange proposal is what informs the Commissioner regarding the minimum standards for the public auction. In the final analysis, the Commissioner may decide that it is not in the best interests of the trust beneficiaries to accept any bid, in which case he may reject all bids. 19.2.21.10(A) NMAC. {118} The majority has declared this procedure invalid. Maj. Op. 1170. I am more persuaded by the following analysis of the Hawai'i Territorial Supreme Court in Fasi v. King, 41 Haw. 461, 1956 WL 10320 (1956). So, in this case, a situation is presented where a prospective purchaser states to the commissioner that it desires to purchase a parcel of land which in location and area is suited for a particular type of use that it is contemplating and that it is willing to make improvements thereon of specified minimum cost. The commissioner determines that the proposal is in the interest of the development of the area in which the land is located. She makes a decision to offer the land for sale. The board of public lands agrees. The decision is not that the sale be made to this prospective purchaser. The decision is that here is a proposal for improvement which is in the interest of the development of the area; here is a prospective purchaser who is willing to meet the minimum standard of improvement which is deemed desirable by the commissioner and the board; there may be other prospective purchasers who may be willing to exceed that standard; so let the Temtory offer the land for sale with conditions to assure that at least that minimum standard will be met. Id. at 468, 1956 WL 10320 (emphasis added). Pre-auction discussions will assist the Commissioner in determining the minimum standards that will help him or her develop new and profitable strategies that are consistent with enhancing the trust corpus and honoring the best interests of the trust beneficiaries. The public auction itself will permit the public to exceed the minimum standards, thus giving rise to the highest and best bid. {119} In this case, the Commissioner asserts that the land exchange will increase the value of the trust corpus by $13,000,000 and make management of the land more efficient and economical. Advertising these minimum standards seems to me to be consistent with the Commissioner’s fiduciary obligations. Certainly other minimum standards will shrink the universe of minimum bidders, yet we would not declare such minimum standards to be invalid. For example, in leasing lands for grazing, the Commissioner might insist on the bidder having specified minimum levels of competence, such as range management experience or education in order to ensure a level of competence that will help protect the land from overgrazing, soil erosion, damage to streams, and other damage. These management strategies are better left to the Commissioner’s discretion. His position is not apolitical. Because he is an elected official, the pressures of the general public may very well influence his management strategies. However, we should not interfere with his discretion when the exercise of that discretion is proven to be in the trust beneficiaries’ best interests. {120} With respect to the highest and best bid, immediate revenue is not the sole consideration in determining the trust beneficiaries’ best interests. Campana, 860 P.2d at 1344. The requirement of a highest and best bid is not for the bidders’ benefit; it is for the benefit of the trust beneficiaries. Bancamerica-Blair Corp. v. State Highway Comm’n, 265 Ky. 100, 95 S.W.2d 1068, 1070-71 (App.1936), superseded by statute on other grounds as stated in Pendleton Bros. Vending, Inc. v. Commonwealth Finance & Admin. Cabinet, 758 S.W.2d 24 (Ky.1988). However, because the consideration for the land is not limited to money, the Commissioner must exercise judgment to determine whether the bids would advance the interests of the trust and its beneficiaries. See Brown v. City of Phoenix, 77 Ariz. 368, 272 P.2d 358, 363-64 (1954). As minimum security to the trust beneficiaries, the Enabling Act requires that the trust lands be appraised at their true value, and the consideration received must at least equal that appraised value. Enabling Act § 10. If in addition to obtaining consideration with at least equal the true appraised value of the trust lands the Commissioner is able to reduce the expense of land management and prevent the destruction of the trust property, one cannot contend that the Commissioner has breached his fiduciary duty. In addition, the concerns expressed by Congress when enacting the Enabling Act will have been allayed, since the land will not have been disposed of for less than its fair value. VI. VOTER REJECTION OF A CONSTITUTIONAL AMENDMENT DOES NOT DEFINE THE STATUS QUO {121} The majority finds significant to its analysis the 1990 voter rejection of an amendment to the Enabling Act. Maj. Op. ¶ 9. The proposed amendment sought to “clarify the authority of the Commissioner of Public Lands to exchange lands under his control.” The fact that the electorate rejected the amendment does not define the status quo; we must still interpret existing law. Law is not made by defeating bills or constitutional amendments. State ex rel Udall v. Pub. Employees Ret. Bd., 118 N.M. 507, 512, 882 P.2d 548, 553 (Ct.App.1994), rev’d on other grounds, 120 N.M. 786, 907 P.2d 190 (1995). Rejection of legislation does not offer any insight into the meaning of existing law. Red Lion Broad. Co. v. FCC, 395 U.S. 367, 381 n. 11, 89 S.Ct. 1794, 23 L.Ed.2d 371 (1969) (“unsuccessful attempts at legislation are not the best of guides to legislative intent”); Ingersoll v. Palmer, 43 Cal.3d 1321, 241 Cal.Rptr. 42, 743 P.2d 1299, 1318 (1987) (“We can rarely determine from the failure of the Legislature to pass a particular bill what the intent of the Legislature is with respect to existing law.”); State ex rel. Douglas v. Beermann, 216 Neb. 849, 347 N.W.2d 297, 305 (1984). I am not persuaded that the popular vote is significant to the analysis in this case. {122} History teaches us that the rejection of an amendment does not define the limits of the law. For example, the Child Labor Constitutional Amendment, which would have authorized Congress to limit, regulate, and prohibit the labor of persons under eighteen years of age, was never ratified. Yet the Fair Labor Standards Act has provisions designed to protect the educational opportunities of youth, prohibit their employment in jobs that are detrimental to their health and safety, and restrict the hours that youth under sixteen years of age can work. Fair Labor Standards Act of 1938, 29 U.S.C. § 212 (1974). The constitutionality of the Fair Labor Standards Act has been upheld. United States v. Darby, 312 U.S. 100, 61 S.Ct. 451, 85 L.Ed. 609 (1941). The Equal Rights Amendment, which provided that “[ejquality of rights under the law shall not be denied or abridged by the United States or by any State on account of sex,” was never ratified. Yet the Civil Rights Act of 1964 forbids discrimination on account of gender. {123} Finally, if indeed the 1990 popular vote rejecting amendment of the Enabling Act is as significant as the majority suggests, then why has the majority declined to follow the will of the people during that same election when they declined to validate, ratify, and confirm all exchanges completed by the Land Commissioner before January 1, 1990? If I were persuaded that the Commissioner has a clear and indisputable duty not to engage in land exchanges, I would enforce the Enabling Act as written and declare the land exchanges void. I cannot agree that this Court has the authority to apply its holding prospectively when the Enabling Act itself provides that “[ejvery sale, lease, conveyance or contract of or concerning any of the lands hereby granted or confirmed ... not made in substantial conformity with the provisions of this act shall be null and void.” Enabling Act § 10. {124} For the foregoing reasons, I respectfully dissent. I CONCUR: CHARLES W. DANIELS, Chief Justice. . New Mexico Constitution Article XXIV, Section 1 reserves unto the Legislature the authority to specify the terms and conditions of leases and contracts reserving a royalty to the State from minerals, geothermal steam, and waters on lands confirmed to the State by the act of Congress of June 20, 1910 (the Enabling Act).